UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

TIMOTHY HENSON,

        Plaintiff,

v.

COMMUNITY HEALING CENTERS,

        Defendant.

---

Nicholas Roumel (P37056)
Amanda M. Ghannam (P83065)
Nacht & Roumel, P.C.
101 N. Main St., Ste. 555
Ann Arbor, MI 48104
734-663-7550
nroumel@nachtlaw.com
aghannam@nachtlaw.com
*Attorneys for Plaintiff*

---

**PLAINTIFF'S COMPLAINT AND JURY DEMAND**

Plaintiff, Timothy Henson, states his complaint against Defendant Community Healing Centers as follows:

**INTRODUCTION**

This civil rights action arises out of Defendant Community Healing Centers' blatant retaliation against Mr. Timothy Henson for engaging in various forms of legally protected activity. Mr. Henson excelled at his job for the first two years of his employment – but after he began to raise concerns about COVID-19-related

1

safety violations, racially offensive comments made by his colleagues, and racial disparities in Defendant's pay practices, Defendant swiftly disciplined him and terminated his employment. Beginning in the summer of 2021, Mr. Henson raised concerns both internally and to the Michigan Occupational Health and Safety Administration about COVID-19 safety violations, advocated that his Black woman colleagues should receive appropriate pay raises, and reported racially discriminatory comments both internally and to the Michigan Department of Civil Rights, and the local NAACP chapter. Rather than take Mr. Henson's feedback to heart or make any attempt to improve, Community Healing Centers' Executive Director, Chris Slater, wrote Mr. Henson up, accused Mr. Henson of "undermining his leadership" and terminated his employment. Mr. Henson now brings this action under 42 U.S.C. 1981, the Michigan Elliott-Larsen Civil Rights Act, the Whistleblower Protection Act, and Michigan's Covid-19 Employment Rights Act.

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff, Timothy Henson, is a resident of Portage, Michigan, within the Western District of Michigan.

2. Defendant, Community Healing Centers, is a domestic nonprofit corporation with its principal location in Kalamazoo, Michigan, within the Western District of Michigan.

3. This Court has federal question jurisdiction pursuant to 42 U.S.C.§1981, 28 U.S.C. §1331 (federal question jurisdiction), and 28 U.S.C. §1343(a)(4) (jurisdiction over civil rights claims).

4. Supplemental jurisdiction over Plaintiff's state law claims is proper pursuant to 28 U.S.C. §1367 as they arise from the same case and controversy.

5. Venue in this Court is proper pursuant to 28 U.S.C. §1391 as a substantial part of the events and omissions giving rise to this Complaint occurred in Kalamazoo, Michigan, located within this judicial district.

## GENERAL ALLEGATIONS

6. Plaintiff, Timothy Henson, is an experienced and dedicated licensed clinical social worker (LMSW-C) with both his Master of Social Work and Master of Public Health degrees.

7. Mr. Henson's work experience includes over ten years in various community-oriented roles such as supporting international social workers in cultural acclimation, supporting children with special needs, supervising mental health clinicians, and providing therapy to individuals and families.

8. In August 2019, Mr. Henson began his employment as the Clinical Director of Children's Services with Defendant Community Healing Centers.

9. As Clinical Director of Children's Services, Mr. Henson's main role was to "supervise and act as liaison between all children/adolescent services clinical

programs and the Executive Director regarding the impact of policies, procedures, and professional practices."

10. As a Director, Mr. Henson was part of Defendant's Executive Leadership Team.

11. At all relevant times, Mr. Henson excelled at his job duties.

12. In his 2020 and 2021 Annual Performance Reviews, Mr. Henson received overwhelmingly positive ratings of Highly Effective and Proficient.

13. Mr. Henson received merit-based salary increases in September 2020 and again in April 2021, after his positive performance reviews.

**Defendant's Executives Make Offensive Race-Based Comments about Minority Colleagues to Mr. Henson**

14. In July 2020, Mr. Henson became the supervisor of another employee named Charlene Taylor.

15. Ms. Taylor is Black/African-American.

16. In early August 2020, Defendant's Director of Human Resources, Mark Ferguson, summoned Mr. Henson to a closed-door meeting.

17. On information and belief, Mark Ferguson identifies as Caucasian.

18. Mr. Ferguson purported to "warn" Mr. Henson that "the only reason [Ms. Taylor] was still working there was that she plays 'the Black card.'"

19. In February 2021, after interviewing a Black/African-American candidate for another position, Mr. Ferguson stated that he felt the team was "discriminating against white people."

20. Mr. Ferguson stated that the team needed to "get on board" with not considering race in employment applications.

21. Mr. Ferguson stated that "diversity hires are a mistake," implying that Defendant's Black/minority employees had been chosen not because of their qualifications, but solely because of their race.

22. Mr. Ferguson asked Mr. Henson in a hostile and sarcastic manner whether the successful applicant "met the criteria," referring to race.

23. Contrary to Mr. Ferguson's opinion, the interviewers did not know the candidate's race until they arrived for the interview and did not choose the successful applicant based on race or ethnicity.

24. On February 10, 2021, Mr. Ferguson told another Black female employee "Don't you play that card with me" and accused her of "playing the Black card."

25. Mr. Ferguson made these statements in front of other employees and executives, including Mr. Henson and his direct supervisor, then-interim CEO, Mike Pioch.

26. On information and belief, Mike Pioch identifies as Caucasian.

27. Because Mr. Ferguson was the Director of Human Resources, Mr. Henson felt he had no avenue to report Mr. Ferguson's offensive comments.

### Mr. Henson Advocates for Minority Colleagues

28. In June 2021, Chris Slater joined Community Healing Centers as the new Executive Director.

29. On information and belief, Chris Slater identifies as Caucasian.

30. On July 14, 2021, Mr. Slater told Mr. Henson that he would implement all of Mr. Henson's recommendations for salary increases for the employees Mr. Henson supervised.

31. Mr. Henson recommended that a Black woman colleague receive a $2000 raise.

32. Mr. Slater backtracked on his agreement to implement Mr. Henson's recommendations and gave the colleague a pay raise that was only $1000.

33. When this colleague learned that she would be getting a lower raise, she successfully appealed the decision, earning backpay that Defendant had failed to pay her since her previous salary increase.

34. Meanwhile, Defendant gave a non-Black/African-American male colleague a pay raise of $4000.

35. On or about July 19, 2021, Mr. Henson voiced his concerns about Mr. Slater's failure to take his recommendations into account and racial disparities in Defendant's pay structure in an email to Mr. Slater.

**Mr. Henson Reports COVID-19 Safety Concerns Internally and to MIOSHA**

36. On or about July 1, 2021, Defendant retracted its rule requiring all employees to wear masks in the office due to the COVID-19 pandemic.

37. After reviewing the most current CDC, OSHA, and MIOSHA guidelines, Mr. Henson sent an email to Mike Pioch, his direct supervisor at the time, and Mark Ferguson, Director of Human Resources, expressing concern that Community Health Center was violating the law by retracting its mask requirement because the most current guidance still required masks to be worn in healthcare settings.

38. Mr. Pioch responded to Mr. Henson's email to state that Defendant was not a "healthcare setting" and that he was confident that Defendant had taken all the necessary precautions.

39. Mr. Henson contacted MIOSHA to verify that Defendant was in compliance with current law and guidelines.

40. The MIOSHA employee who spoke with Mr. Henson encouraged him to file a safety complaint.

41. After speaking with the MIOSHA employee, Mr. Henson exchanged additional emails with Mr. Pioch in which he disagreed with Mr. Pioch's stance and recommended that Defendant only lift its mask requirement if it began to screen all employees and clients for COVID-19 symptoms upon entry.

42. On July 8, 2021, Mr. Henson received confirmation from MIOSHA that Community Health Centers had been notified of his complaint.

43. On July 9, 2021, Chris Slater sent out a company-wide email regarding the complaint.

44. On multiple occasions including July 12 and July 21, 2021, Mr. Henson reported to Mr. Slater that he was concerned that clients were still not being appropriately screened.

45. Mr. Henson suggested some remedial measures that Defendant could implement in order to reduce the spread of COVID-19.

### Defendant Disciplines Mr. Henson in Retaliation for Engaging in Protected Activity

46. On August 10, 2021, Mr. Slater made significant changes to Defendant's organizational chart.

47. Mr. Slater became Mr. Henson's direct supervisor.

48. Mr. Slater also removed one of Mr. Henson's direct reports.

49. On August 11, 2021, Mr. Henson met with Mr. Slater and Mr. Ferguson.

50. At the meeting, Mr. Slater issued a disciplinary write-up to Mr. Henson.

51. The write-up was Mr. Henson's first instance of discipline in two years of employment with Defendant.

52. In the write-up, entitled "Concerned Conversation/Collaborative Coaching", Mr. Slater accused Mr. Henson of lacking "professionalism" and "leadership."

53. The document stated: "If one or more of the following behaviors is demonstrated and/or expectations is not met or is gone against, you will be placed on a Final Warning. If the next incident is considered egregious, termination may take place."

54. Mr. Slater's purported "professionalism" concern pertained to Mr. Henson's emails regarding the MIOSHA complaints and potential safety violations.

55. Under "Professionalism", Mr. Slater stated:

Tim emailed and said 'maybe I wasn't clear enough.' This is a very passive, off-putting statement and I consider it disrespectful. Furthermore, a staff member of your team was copied on this email. This is highly unprofessional. Please do not copy staff members when addressing or 'calling out' your Executive/Leadership Teammates about possibly sensitive issues.

56. The email referred to by Mr. Slater was one of Mr. Henson's emails regarding potential COVID-19 safety violations and violations of law.

57. Mr. Slater's purported "Leadership" concern pertained to Mr. Henson's emails regarding the MIOSHA complaints and potential safety violations, as well as

9

Mr. Henson's advocacy for his Black woman colleague to receive an appropriate pay raise.

58. Under "Leadership," Mr. Slater stated:

> Another example is from an email dated 7/19/2021 regarding staff salary adjustments in which you state, "I also feel like you, Mike, and Mark made a decision without considering the fact that I would have included that in my rationale for the recommendation I made already" … These are just a couple examples of a trend that is leading me to believe that you may not understand what professional leadership and bonding with your peers entails.

59. This email referred to by Mr. Slater was regarding Mr. Henson's advocacy for his Black woman colleague to receive an appropriate pay raise.

60. The disciplinary document required Mr. Henson to sign an acknowledgement stating:

> I further understand that this is a Concerned Conversation and that a Final Warning – or possible termination – is the next step in the process if I do not abide by the notes included on this document and gleaned from this conversation.

61. In issuing the disciplinary document to Mr. Henson, Mr. Slater had skipped the first two steps in Defendant's progressive discipline policy.

62. Also at the meeting on August 11, Mr. Slater and Mr. Ferguson told Mr. Henson that an unsuccessful Caucasian applicant for a position with Defendant had been "a victim of reverse discrimination."

63. Mr. Henson informed Mr. Slater and Mr. Ferguson that the unsuccessful applicant had in fact not been chosen because he arrived for his

interview dressed in a sweaty T-shirt and was generally unprepared and unprofessional.

64. Mr. Slater and Mr. Ferguson also instructed Mr. Henson to write up a Black employee, Charlene Taylor, for an allegedly "disrespectful" email to Mr. Ferguson and threatened that if he did not do so, he would be disciplined for "insubordination."

65. On September 14, 2021, Mr. Ferguson emailed Mr. Henson an altered version of the "Collaborative Coaching" disciplinary document.

66. The new version of the document was less detailed, had removed the punitive language regarding final warnings and termination, and included Mr. Slater and Mr. Ferguson's signatures dated 9-14-2021.

**Mr. Henson Reports Defendant's Conduct Internally and to MIOSHA, the MDCR, and the NAACP**

67. On August 13, 2021, Mr. Henson and Charlene Taylor met with Mr. Pioch.

68. Mr. Henson reported multiple examples of the comments, as described above, that he had perceived as race-based and offensive.

69. Mr. Pioch then met with Mr. Slater and Mr. Ferguson separately.

70. On August 25, 2021, Mr. Pioch told Mr. Henson that he had "completed an investigation" and asked him "what he hoped would happen."

71. Mr. Henson complained to Mr. Pioch that he felt it was discriminatory and retaliatory that he (Mr. Henson) had been written up for his safety concerns and advocacy, but Mr. Ferguson had never been written up for his racially inflammatory comments.

72. Mr. Henson asked Mr. Pioch to speak to other witnesses and requested that an independent party investigate the situation.

73. Mr. Pioch told Mr. Henson that Mr. Ferguson "couldn't be racist."

74. When Mr. Henson reiterated his reports of Mr. Ferguson accusing employees of "playing the Black card," Mr. Pioch replied: "To be fair, some employees do play that card."

75. On September 3, 2021, Mr. Pioch sent a summary of Mr. Henson's concerns to Mr. Slater and Mr. Ferguson.

76. Instead of taking Mr. Henson's concerns seriously, Mr. Ferguson replied: "Tim Henson is being retaliatory with his accusations… He is striking out and using the most damaging accusations possible… Tim has a pattern of embellishment and even lying to add impact to whatever case he is presenting."

77. On August 26, 2021, Mr. Henson reported to MIOSHA that he felt the disciplinary write-up had been issued in retaliation for his previous complaints.

78. On September 1, 2021, Mr. Henson filed a Complaint with the Metropolitan Kalamazoo Branch of the NAACP (National Association for the

Advancement of Colored People), reporting the pay disparities and racially inflammatory comments and atmosphere created by Defendant's executives.

79. On September 23, 2021, Dr. Henry Cohen of the NAACP filed a complaint with the IRS on the grounds that Defendant had potentially violated the terms of its 501(c)(3) tax-exempt status by violating federal and state civil rights laws.

80. On October 15, 2021, Mr. Henson filed a Charge of Discrimination with the Michigan Department of Civil Rights ("MDCR") alleging that Defendant had subjected him to unlawful retaliation and a hostile work environment because of his advocacy for his Black colleagues.

### Defendant Terminates Mr. Henson's Employment

81. After Mr. Henson's reports of discrimination and retaliation, Mr. Slater began to avoid and ignore Mr. Henson.

82. Mr. Slater canceled meetings with Mr. Henson.

83. Mr. Slater refused to make eye contact or acknowledge Mr. Henson when they passed each other in the office.

84. On November 3, 2021, Mr. Slater sent Mr. Henson a termination letter stating:

> Since I joined Community Healing Centers in June 2021 and even before, you have consistently sought to undermine my leadership and effectiveness as Executive Director… Community Healing Centers

cannot afford to have an employee who has such a negative attitude towards me or the organization.

## COUNT I
## Retaliation in Violation of 42 U.S.C. 1981

85. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

86. 42 U.S.C. 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

87. The United States Supreme Court has held that 42 U.S.C. 1981 encompasses retaliation claims and protects individuals who advocate on behalf of minorities from retaliation regardless of their own race. *See CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 451 (2008).

88. Plaintiff engaged in activity protected by 42 U.S.C. 1981 by his actions including, but not limited to, advocating for his Black colleagues to receive appropriate pay raises; reporting racially discriminatory comments made by his colleagues; complaining that he received discipline for his advocacy while the makers of the offensive comments did not; and reporting his concerns to the MDCR and the NAACP.

89. Defendant subjected Plaintiff to adverse employment actions including a disciplinary write-up and termination.

90. Defendant's conduct was motivated by Plaintiff's protected activity.

91. But for Plaintiff's protected activity, Defendant would not have subjected him to such adverse actions.

## COUNT II
### Retaliation in Violation of the Elliott-Larsen Civil Rights Act
### M.C.L. 37.2201 *et seq.*

92. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

93. At all relevant times, Defendant was an employer and Plaintiff was an employee covered by and within the meaning of the Elliott-Larsen Civil Rights Act, M.C.L.37.2202 *et seq.*

94. Plaintiff engaged in activity protected by the Elliott-Larsen Civil Rights Act by his actions including, but not limited to, advocating for his Black colleagues to receive appropriate pay raises; reporting racially discriminatory comments made by his Caucasian colleagues; complaining that he received discipline for his advocacy while the makers of the offensive comments did not; and reporting his concerns to the MDCR and the NAACP.

95. Defendant subjected Plaintiff to adverse employment actions including a disciplinary write-up and termination.

96. Defendant's conduct was motivated by Plaintiff's protected activity.

97. But for Plaintiff's protected activity, Defendant would not have subjected him to such adverse actions.

## COUNT III
### Violation of the Michigan Whistleblower Protection Act
### M.C.L. 15.361 *et seq.*

98. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

99. The Michigan Whistleblowers' Protection Act ("WPA") prohibits employers from terminating an employee who "reports or is about to report…a violation or a suspected violation of a law…to a public body." M.C.L. 15.362.

100. The Michigan Department of Civil Rights is a "public body" as defined by the WPA.

101. Plaintiff engaged in activity protected by the WPA when he reported Defendant's violations or suspected violations of law to the Michigan Department of Civil Rights.

102. Defendant was aware of Plaintiff's complaint to the Michigan Department of Civil Rights.

103. Defendant subjected Plaintiff to adverse employment actions including termination.

104. Defendant's conduct was motivated by Plaintiff's protected activity.

105. But for Plaintiff's protected activity, Defendant would not have terminated Plaintiff's employment.

## COUNT IV
### Violation of Michigan's Covid-19 Employment Rights Act
### M.C.L. 419.403 et seq.

106. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

107. On October 22, 2020, the Michigan Legislature passed Public Act 238 of 2020, including M.C.L. 419.403, which was designed to "prohibit an employer from taking certain actions against an employee who does not report to work under certain circumstances related to COVID-19; to prohibit an employee from reporting to work under certain circumstances related to COVID-19; to prohibit discrimination and retaliation for engaging in certain activities; and to provide remedies."

108. M.C.L. 419.403 states that an employer "shall not discharge, discipline, or otherwise retaliate against an employee who … (b) opposes a violation of this act or (c) reports health violations related to COVID-19."

109. Plaintiff reported health violations related to COVID-19 both internally and to MIOSHA when he raised concerns about Defendant's improper lifting of its mask mandate and its failure to appropriately screen clients and employees for COVID-19 symptoms.

110. Defendant subjected Plaintiff to adverse employment actions, including a disciplinary write-up and termination, in retaliation for his report of health violations related to COVID-19.

111. M.C.L. 419.407 states that "[a]n employee aggrieved by a violation of this act may bring a civil action for appropriate injunctive relief or damages, or both, in the circuit court for the county where the alleged violation occurred or for the county where the employer against whom the action is filed is located or has its principal place of business."

112. M.C.L. 419.407(2) states that a court "shall award to a plaintiff who prevails in an action brought under this act damages of not less than $5000.00."

## DAMAGES

As a direct and proximate result of Defendant's conduct, Plaintiff has suffered damages including a loss of earnings and benefits, impairment of his earning capacity and ability to work, emotional and physical distress, loss of reputation, humiliation and embarrassment, and will so suffer in the future.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## RELIEF REQUESTED

Wherefore, Plaintiff Timothy Henson respectfully requests that this Honorable Court grant the following relief:

- Declare that the aforementioned practices and actions of Defendant constitute unlawful employment practices in violation of 42 U.S.C. 1981, the Elliott-Larsen Civil Rights Act, the Whistleblower Protection Act, and M.C.L. 419.403;

- Award Plaintiff all lost wages, past and future, to which he is entitled;

- Award Plaintiff compensatory damages;

- Award Plaintiff punitive and exemplary damages;

- Award Plaintiff reasonable attorney's fees, costs, and interest; and

- Award such other relief as this Court deems just and proper.

Wherefore, Plaintiff respectfully requests that this Court enter judgment against Defendant and all relief requested in this Complaint.

Respectfully submitted,

By: */s/ Amanda M. Ghannam*

Nicholas Roumel (P37056)
Amanda M. Ghannam (P83065)
Nacht & Roumel, P.C.
Attorneys for Plaintiff
101 N. Main St., Ste. 555
Ann Arbor, MI 48104
(734) 663-7550
nroumel@nachtlaw.com
aghannam@nachtlaw.com

January 6, 2022